IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Craig B. Shaffer

Civil Action No. 10-cv-00309-CBS-BNB

KIMBERLY N. SQUIRES, by and through her Guardian and Natural Parent, LYLE K. SQUIRES,
     Plaintiff,
v.

JAMES MICHAEL GOODWIN, an individual,
BRECKENRIDGE OUTDOOR EDUCATION CENTER, a Colorado corporation, and
MOUNTAIN MAN, INC., a Montana corporation,
     Defendants.
_____

MEMORANDUM OPINION AND ORDER
_____

This civil action comes before the court on Defendant Breckenridge Outdoor Education Center's (BOEC's) Motion for Summary Judgment (filed December 3, 2010) (Doc. # 52). On September 16, 2010, the above-captioned case was referred to Magistrate Judge Craig B. Shaffer to handle all dispositive matters including trial and entry of a final judgment in accordance with 28 U.S.C. 636(c), Fed. R. Civ. P. 73, and D.C. COLO. LCivR 72.2. (*See* Doc. # 42). The court has reviewed the Motion, Ms. Squires' Response (filed January 6, 2011) (Doc. # 56), BOEC's Reply (filed January 24, 2011) (Doc. # 61), BOEC's Notice of Supplemental Authority (filed April 18, 2011) (Doc. # 76), Ms. Squires' Response to BOEC's Notice of Supplemental Authority (filed May 12, 2011) (Doc. # 81), Ms. Squires' Reply Memorandum Brief Regarding Misrepresentation (filed May 30, 2011) (Doc. # 84), BOEC's Surreply Brief regarding Misrepresentation (filed June 6, 20110) (Doc. # 89), the affidavit, the exhibits, the arguments presented at the hearing held on July 20, 2011, and the entire case file and is sufficiently advised in the premises.

1

I.      Statement of the Case

Ms. Squires' claim against BOEC arises out of a ski accident ("the Accident") that occurred at Breckenridge Ski Resort, Colorado on February 13, 2008.  BOEC is a nonprofit Colorado corporation that provides outdoor experiences for people with disabilities.  (*See* SAC (Doc. # 13) at 2-3, ¶ 6; Scheduling Order ("SO") (Doc. # 40) at 7 of 15 (Undisputed Facts)).  At all relevant times, Ms. Squires was 17 years old, legally blind, cognitively delayed, and physically limited by cerebral palsy.  (*See* SAC at 1-2, ¶ 2).

BOEC employed Jennifer Phillips as a para-ski instructor at the time of the Accident. (*See* SO at 7 of 15).  On the morning of the Accident, Ms. Squires was paired with Ms. Phillips and placed in a bi-ski.  (*See id.*).  The bi-ski was manufactured by Defendant Mountain Man.  (*See id.*).  Ms. Phillips and Ms. Squires went to Peak 9 at Breckenridge Ski Resort.  (*See id.*).  Ms. Phillips utilized tethers as a means to control the bi-ski.  (*See* SAC at 5 of 13, ¶ 16).  On their second run, Ms. Squires and Ms. Phillips skied down Cashier trail. (*See* SO at 7 of 15).  Defendant Goodwin was also skiing down Cashier trail.  (*See id.*). Defendant Goodwin lost control and skied into the tethers between Ms. Squires and Ms. Phillips.  (See Goodwin Deposition, Exhibit B to Motion (Doc. # 52-2), at 2, 3 of 3).  Due to the force of the collision with Defendant Goodwin, Ms. Phillips lost control of the tethers and the bi-ski containing Ms. Squires continued down Cashier trail unrestrained until it collided with a tree.  (*See* SAC at 5 of 13, ¶ 19;  BOEC's Answer to SAC (Doc. # 27) at 2-3 of 8, ¶ 12).  Ms. Squires was injured when the bi-ski collided with a tree.  (*See* SO at 7 of 15).

Ms. Squires filed her initial Complaint on February 12, 2010, alleging five claims for relief against Defendants Goodwin and BOEC based on diversity of citizenship jurisdiction.

(*See* Doc. # 1).   She filed her First Amended Complaint ("FAC") on April 15, 2010, alleging nine claims for relief against Defendants Goodwin, BOEC, and Mountain Man, Inc. ("Mountain Man").   (*See* Doc. # 5).   Ms. Squires refiled her First Amended Complaint on April 19, 2010 pursuant to a request from the Clerk of the Court.   (*See* Doc. # 11).   Ms. Squires filed her Second Amended Complaint ("SAC"), the current operative pleading, on June 2, 2011, alleging nine claims against Defendants Goodwin, BOEC, and Mountain Man.   (*See* Doc. # 13).   Ms. Squires' First, Second, Third, and Fourth Claims for Relief allege negligence per se under the Ski Safety Act, Colo. Rev. Stat. § 33-44-109(2) and common law negligence against Defendant Goodwin.   (*See* Doc. # 13 at 6-7 of 13).   Ms. Squires' Fifth Claim for Relief alleges negligence, willful and wanton, reckless, and/or gross negligence against Defendant BOEC.   (*See id.* at 8-9 of 13).   The court granted summary judgment in favor of Defendant Mountain Man on Ms. Squires' Sixth, Seventh, Eighth, and Ninth Claims for Relief for strict products liability, breach of implied warranty of fitness and/or merchantability, common law negligence, and breach of express warranty.   (*See id.* at 9-12 of 13; "Order on Pending Motions" (Doc. # 119)).

Defendant BOEC moves for summary judgment on the Fifth Claim for Relief in the SAC on the grounds that Ms. Squires is prevented from bringing the claim by a valid release of liability.

II.      Standard of Review

"Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and the . . . moving party is entitled to judgment as a matter of law."

*Montgomery v. Board of County Commissioners of Douglas County, Colorado*, 637 F. Supp.

2d 934, 939 (D. Colo. 2009) (internal quotation marks and citations omitted).  "When applying

this standard, the court must view the evidence and draw all reasonable inferences therefrom

in the light most favorable to the party opposing summary judgment."  *Id.*  "All doubts must be

resolved in favor of the existence of triable issues of fact."  *Id.*  However, if a party fails to

properly support an assertion of fact or fails to properly address another party's assertion of

fact, "the court may . . . grant summary judgment if the motions and supporting materials –

including the facts considered undisputed – show that the moving party is entitled to it."  Fed.

R. Civ. P. 56(e).


III.    Analysis

A.    Release of Negligence Claim under Colo. Rev. Stat. § 13-22-107

Prior to the Accident, on January 13, 2008, Ms. Squires and her mother, Mrs. Squires,

signed an "Acknowledgement [sic] of Risk and Release of Liability" ("Release").  In Colorado,

the parent of a child may, on behalf of the child, release or waive the child's prospective

claim for negligence.  Colo. Rev. Stat. § 13-22-107.  The statute requires that such a

decision be "voluntary and informed."  Colo. Rev. Stat. § 13-22-107(1)(a)(V).

> (1)(a) The general assembly hereby finds, determines, and declares it is the
> public policy of this state that:
> (I) Children of this state should have the maximum opportunity to participate in
> sporting, recreational, educational, and other activities where certain risks may
> exist;
> (II) Public, private, and non-profit entities providing these essential activities to
> children in Colorado need a measure of protection against lawsuits, and without

the measure of protection these entities may be unwilling or unable to provide
the activities;

(III) Parents have a fundamental right and responsibility to make decisions
concerning the care, custody, and control of their children. The law has long
presumed that parents act in the best interest of their children.

(IV) Parents make conscious choices every day on behalf of their children
concerning the risks and benefits of participation in activities that may involve
risk;

(V) These are proper parental choices on behalf of children that should not be
ignored. So long as the decision is voluntary and informed, the decision should
be given the same dignity as decisions regarding schooling, medical treatment,
and religious education; and

(VI) It is the intent of the general assembly to encourage the affordability and
availability of youth activities in this state by permitting a parent of a child to
release a prospective negligence claim of the child against certain persons and
entities involved in providing the opportunity to participate in the activities.
. . .

(3) A parent of a child may, on behalf of the child, release or waive the child's
prospective claim for negligence.

(4) Nothing in this section shall be construed to permit a parent acting on behalf
of his or her child to waive the child's prospective claim against a person or
entity for a willful and wanton act or omission, a reckless act or omission, or a
grossly negligent act or omission.

Colo. Rev. Stat. § 13-22-107.

"Because waiver is an affirmative defense, the Defendant has the burden to prove

waiver." *Wycoff v. Grace Community Church of the Assemblies of God*, 251 P.3d 1260,

1277 (Colo. App. 2010) (Furman, J, dissenting) (citing C.R.C.P. 8(c)).  Ms. Squires argues

that BOEC is not entitled to summary judgment on the Fifth Claim for Relief based on the

Release because her mother's decision to sign the Release was not informed.[1]  Relying on

*Wycoff*, 251 P.3d at 1260, Ms. Squires argues that the decision was not informed because

the Release did not inform Mrs. Squires of the risks associated with BOEC's winter program,

---

[1]    Ms. Squires concedes that Mrs. Squires signed the Release voluntarily.  (See, e.g.,
Doc. # 84-4 at 6 of 7).

failing to "mention skiing, skis, ski slopes, ski lifts, or anything at all specific to skiing." (*See* Response (Doc. # 56) at 9 of 19).

In *Wycoff*, a 17-year old minor attending a church-sponsored event was injured when she was riding on an inner-tube towed by an ATV on a frozen lake. *Wycoff*, 251 P.3d at 1263.  The minor and her mother had signed the registration and information form that contained a release.  *Id.*  While the minor was aware that riding on an inner-tube towed by an ATV on a frozen lake would be an activity at the event, her mother was not.  *Wycoff,* 251 P.3d at 1263.  The court in *Wycoff* interpreted § 13-22-107(3) to require that a parent's decision to release a child's prospective claims be "voluntary and informed."  *Id.*  Although the court noted the standard for informed consent to a medical procedure, it did not adopt that standard for a parental release of claim.  *Wycoff*, 251 P.3d at 1264.  Without setting forth precisely how much information is required for a parental release to be "voluntary and informed," the court held that a one-page "registration and information" form, which happened to contain one sentence in the last paragraph stating, "I will not hold Grace Community Church or it's [sic] participants responsible for any liability which may result from participation," was legally insufficient to release a child's negligence claim.  *Id.* at 1265.  The court agreed that "[a] release need not contain any magic words to be valid," but recognized that "in every Colorado Supreme Court case upholding an exculpatory clause, the clause contained some reference to waiving personal injury claims based on the activity being engaged in."  *Wycoff*, 251 P.3d at 1265.  The "registration and information" form held inadequate in *Wycoff* made no reference to the subject activity or to waiving personal injury claims, nor did it provide parents with information allowing them to assess the degree of risk

6

and the extent of possible injuries from any activity.  *Id.*

The Release here provides in pertinent part:

In consideration of being allowed to participate in any way in Breckenridge Outdoor Education Center (BOEC) programs, and related events and activities. . . I, and/or the minor student, and/or the person for which I am legal guardian, the undersigned:

1.      Understand that although the BOEC has taken precautions to provide proper organization, supervision, instruction and equipment for each course, it is impossible for the BOEC to guarantee absolute safety. Also, I understand that I share the responsibility for safety during all activities, and I assume that responsibility. . . .
2.      Understand that risks during outdoor programs include but are not limited to loss or damage to personal property, injury, permanent disability, fatality, exposure to inclement weather, slipping, falling, insect or animal bites, being struck by falling objects, immersion in cold water, hypothermia (cold exposure), hyperthermia (heat exposure), and severe social or economic losses that may result from any such incident. I also understand that such accidents or illnesses may occur in remote areas without easy access to medical facilities or while traveling to and form the activity sites. Further, there may be other risks not known to me or not reasonably foreseeable at this time.
3.      Agree that prior to participation, I will inspect, to the best of my ability, the facilities and equipment to be used. If I believe anything is unsafe, I will immediately advise the BOEC staff present of such condition and refuse to participate.
4.      Assume all the foregoing risks and accept personal responsibility for the damages due to such injury, permanent disability or death resulting from participating in any BOEC activity.

I hereby release the BOEC, its successors, representatives, assigns, and employees from any and all claims, demands, and causes of action, whether resulting from negligence or otherwise, of every nature and in conjunction with a BOEC activity.

(*See* Exhibit A to Motion (Doc. # 52-1)).  On the other side of the Release was a letter of

explanation ("Greetings Letter") that the court may consider as evidence of whether the

decision to sign the Release was informed.  (*See id.* at 4 of 5; Deposition of Sara Squires,

Appendix 4 to Ms. Squires' Reply (Doc. # 84-4) at 3 of 7).  *See Wycoff*, 251 P.3d at 1264

("We will assume for purposes of this case that a facially deficient exculpatory contract could

be cured by extrinsic evidence."); *Glover v. Innis*, 252 P.3d 1204, 1209 (Colo. App. 2011)

(extrinsic evidence permitted not to contradict or vary terms of an agreement, but to show

waiver of a provision of the agreement).  The Greetings Letter stated in pertinent part:

> Your ski lesson or course will involve risk, which may be greater than most people encounter in their daily lives. Providing high quality programs in a risk-managed environment is a priority at the BOEC. It is, however, impossible to eliminate all risks. It is very important that you follow all directions given by staff and that you ask questions whenever a procedure or activity is unclear to you.
>
> While the BOEC maintains rigorous standards, it is in everyone's best interest that risks are disclosed, understood, and assumed prior to participation. After you have reviewed the acknowledgement of risk and waiver of liability on the reverse side of this letter and if you understand and agree with its contents, please sign in the appropriate places. If you are the parent or legal guardian of a student, please read both sides of this document to the student, and if you both agree and understand their content, place YOUR signature in the three appropriate places[.]

(*See* Doc. # 61-1 at 4 of 5).

A finding that Mrs. Squires' decision to sign the Release was informed is not

inconsistent with the analysis in *Wycoff*, 251 P.3d at 1260.  First, the release in *Wycoff* was

one sentence that "state[d] only that plaintiff will not hold Grace 'responsible for any liability

which may result from participation,' " surrounded by sentences addressing different topics.

Here, the Release  was clearly entitled at the top "*Acknowledgement [sic] of Risk and*

*Release of Liability*," in large, italicized letters.  (*See* Doc. # 52-1).  The first sentence again

states, "<u>ACKNOWLEDGMENT OF RISK AND RELEASE OF LIABILITY (REQUIRED)</u>" in

capital letters and underlined.  *Id.*  The Release signed by Ms. Squires was clearly identified

as a waiver and release of liability.

Second, the Release includes one full page that explains in detail the degree of risk

involved with BOEC outdoor programs, events, activities, and/or courses; the extent of

possible injuries from any activity, including injury, permanent disability, fatality, and other

risks not known or not reasonably foreseeable; participation in activities and the use of

equipment; and the release of BOEC from any all and claims, whether resulting from

negligence or otherwise.  (*See* Doc. # 52-1).  Ms. Squires was a participant in a BOEC winter

outdoor program that included skiing.  The Release refers to outdoor programs and sets forth

a detailed explanation of the possible risks of injury to property and person.  (*See id.*).

It is conceded that when she signed the Release, Mrs. Squires knew that her daughter

would be skiing during her trip to Colorado.  (*See* Doc. # 56 at 10 of 19).  Nevertheless, Ms.

Squires argues that the Release did not provide any, much less adequate, information

regarding the inherent risks of skiing or describe the particular risks of the sit-down ski that

she used and that it would be controlled by her instructor with tethers.  Ms. Squires provides

an affidavit from Mrs. Squires stating that, in response to her telephone inquiry, a BOEC

employee instructed her to mark "Sit-Down" and "Bi-Ski" on the "Wilderness/Ski Group

Information" Form, and that no one from BOEC explained to her what a "Sit-Down" or "Bi-Ski"

was.  (*See* Affidavit of Sara A. Squires, Exhibit 1 to Response (Doc. # 56-1); Doc. # 84-4 at 5

of 7).

Mr. and Mrs. Squires were provided the BOEC forms and applications to be

completed in advance of the trip, including the Release, by Andrea Breier, Director of the

Adventure Fitness Program at Camp Fire USA at the time, the group that organized the ski

trip that Ms. Squires attended.  (*See* Affidavit of Andrea Breier, Exhibit D to Reply (Doc. # 61-

1) at 1-2 of 5).  Mrs. Squires had opportunities to ask questions about the ski trip and the

forms before her daughter's trip to Colorado.  (*See id.* at 2 of 5).   Ms. Breier specifically

recalls explaining to Mrs. Squires that Ms. Squires would be seated when skiing, that BOEC

uses sleeping bags to pad the bucket seat, that students in wheelchairs have two assistants

helping them, and that the instructor uses guide ropes to steer the ski down the mountain.

(*See id.*).   Mrs. Squires knew that her daughter would be using some form of sit-down ski on

this trip because her primary means of mobility was by wheelchair and she would not have

been able to ski down the mountain standing up.  (*See id.*).   Mrs. Squires completed the

BOEC application and Release and provided Ms. Breier a typewritten summary that

explained Ms. Squires' conditions, limitations, and medical needs.  (*See* Doc. # 61-1 at 2 of

5, ¶ 11).   Mrs. Squires also wrote a detailed letter to BOEC, stating in pertinent part:

> Sometimes during activities such as skiing, kids who have an implanted
> baclofen pump can experience withdrawal.[2] If she is in a "bucket"/"basket" type
> ski, where she might be more scrunched up, or her body is more compressed
> down, then the catheter line can become pinched or kinked up. If they use the
> bucket type, then her rehab doctor recommends that she ski for about 2 hrs
> and then be allowed to stand up to help "straighten" out the line. Then, go back
> to skiing again. If they use a "sit down ski" where she is more upright (like sitting
> in a wheelchair), then she shouldn't have any problems. I am not familiar with
> the types of equipment they have, but am only saying what other families
> whose children also have pumps have told me about the equipment.

(Letter from Sara Squires dated February 12, 2008, Exhibit E to Reply (Doc. # 61-2)).

Despite that the Release does not specifically include the words, "skiing," "sit-down,"

or "bi-ski," Mrs. Squires understood that her daughter would be seated in some type of sit-ski

on the trip.  While Mrs. Squires claims to have had no knowledge of what a sit-down bi-ski

was at the time she signed the Release, the evidence demonstrates that she had sufficient

---

[2]   Ms. Squires had a surgically inserted baclofen pump, which dispenses medication for
muscle spasms.

notice and knowledge of the activities that her daughter would be participating in and the associated risks.  Mrs. Squires conscientiously made inquiries to BOEC about the forms and the trip.  (*See* Doc. # 84-4 at 5 of 7).  Mrs. Squires was familiar with releases generally.  (*See* Doc. # 84-4 at 4 of 7 ("Because . . . every single program on the face of the earth has a risk and release of liability and some verbiage to that effect."); *see also* 6 of 7 ("It's the same identical verbiage that is in every single risk and release of liability that I've signed for 20 years on Kimberley's behalf for everything that she has ever participated in.").  Ms. Squires' parents were informed that she would be skiing in Breckenridge, Colorado, in a type of sit-down ski, controlled by an instructor with tethers.  The Release specifically refers to outdoor activities and associated risks and was accompanied by a cover letter that explained the risks involved with ski lessons, including the possibility of serious injury and even death.  The Release provides that risks during outdoor programs include injury, permanent disability, fatality, severe social or economic losses, and other risks not known or reasonably foreseeable.  *See Hamill*, 2011 WL 1168006 at * 8 (that "mother may not have contemplated the precise mechanics of her daughter's fall does not invalidate the release and does not create a genuine issue of material fact").  When she signed the Release, Mrs. Squires had sufficient information "to assess the degree of risk and the extent of possible injuries from any activity," *Wycoff*, 251 P.3d at 1265, and to make an informed decision to release any claims that Ms. Squires may have had against BOEC.

B.      Validity of Release

The court having determined that the decision to release Ms. Squires' prospective claims was informed pursuant to Colo. Rev. Stat. § 13-22-107(1)(a)(V), the court must next

determine whether the Release was legally valid.  "Exculpatory agreements are construed strictly against the party seeking to limit its liability."  *Hamill v. Cheley Colorado Camps, Inc.*, ___ P. 3d ___, 2011 WL 1168006, * 1 (Colo. App. March 31, 2011) (citation omitted).  "The determination of the sufficiency and validity of an exculpatory agreement is a question of law for the court to determine."  *B & B Livery, Inc. v. Riehl*, 960 P.2d 134, 136 (Colo. 1998); *see also Robinette v. Aspen Skiing Co., LLC*, 2009 WL 1108093 at *2 (D. Colo. Apr. 23, 2009), *aff'd*, 363 Fed. Appx. 547 (10th Cir. 2010) (citing *B & B Livery*, 960 P.2d at 136).   "Although an exculpatory agreement that attempts to insulate a party from liability for his own simple negligence" is disfavored, "it is not necessarily void as against public policy . . . as long as one party is not at such obvious disadvantage in bargaining power that the effect of the contract is to put him at the mercy of the other's negligence."  *Chadwick v. Colt Ross Outfitters, Inc.*, 100 P.3d 465, 467 (Colo. 2004) (citation omitted).  "To be effective, the release must meet four criteria: (i) there must not have been an obvious disparity in bargaining power between the releasor and releasee; (ii) the agreement must set forth the parties' intentions in clear and unambiguous language; (iii) the circumstances and the nature of the service must indicate that the agreement was fairly entered into; and (iv) the agreement may not violate public policy."  *Robinette*, 2009 WL 1108093 at *2 (citations omitted).  BOEC bears the burden of proving each of these elements.  *See id.*

Where, as here, the service provided is a recreational service and not an essential service, there is no unfair bargaining advantage.  *See Mincin v. Vail Holdings, Inc.*, 308 F.3d 1105, 1112 (10th Cir. 2002) (public need and disparity of bargaining power absent in context of mountain biking and bicycle rental);  *Jones v. Dressel*, 623 P.2d 370, 377-78 (Colo. 1981)

(because recreational skydiving service "was not a matter of practical necessity for even some members of the public" and thus "not an essential service," Defendant did not possess a decisive advantage of bargaining strength over plaintiff); *Potter v. Nat'l Handicapped Sports*, 849 F. Supp. 1407, 1409-10 (D. Colo. 1994) (handicapped downhill ski racing was "a recreational activity, . . . neither a matter of great public importance nor a matter of practical necessity") (citing *Bauer v. Aspen Highlands Skiing Corp.*, 788 F. Supp. 472, 475 (D. Colo. 1992) (upholding an exculpatory clause in the context of ski equipment rental)). Ms. Squires does not challenge BOEC's ability to prove this first element.

Second, the court evaluates whether the Release expresses the parties' intent in clear and unambiguous language. "Interpretation of a written contract and the determination of whether a provision in the contract is ambiguous are questions of law." *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 912 (Colo. 1996) (citation omitted). Ms. Squires argues that the Release is ambiguous and, therefore, invalid, because the language, "[a]lso I understand that I share the responsibility for safety during all activities" expresses a "shared regime of risk," contradicts the language "I hereby release the BOEC, its successors, representatives, assigns, and employees from any and all claims, demands, and causes of action, whether resulting from negligence or otherwise, of every nature and in conjunction with a BOEC activity," and makes the participant/signer solely responsible for any injuries or bad outcomes. (*See* Doc. # 52-1; Doc. # 56 at 15-17 of 19).

"Terms used in a contract are ambiguous when they are susceptible to more than one reasonable interpretation." *Ad Two, Inc. v. City and County of Denver*, 9 P.3d 373, 376 (Colo. 2000). "In determining whether a provision in a contract is ambiguous, the

instrument's language must be examined and construed in harmony with the plain and generally accepted meanings of the words used, and reference must be made to all the agreement's provisions." *Ringquist v. Wall Custom Homes, LLC*, 176 P.3d 846, 849 (Colo. App. 2007) (citations omitted). "The meaning and effect of a contract is to be determined from a review of the entire instrument, not merely from isolated clauses or phrases." *Moland v. Industrial Claim Appeals Office of State*, 111 P.3d 507, 510 (Colo. App. 2004). Specific terms, such as "negligence," are not required for an exculpatory agreement to shield a party from negligence claims. *Potter*, 849 F. Supp. at 1410 (citing *Heil Valley Ranch, Inc. v. Simkin*, 784 P.2d 781, 785 (Colo. 1989) (noting that the release was written in simple and clear terms that were free from legal jargon, the release was not inordinately long and complicated, the plaintiff indicated in her deposition that she understood the release, and the first sentence of the release specifically addressed a risk that described the circumstances of the plaintiff's injury)). The inquiry is not whether specific terms are used, but "whether the intent of the parties was to extinguish liability and whether this intent was clearly and unambiguously expressed." *Id. See also Chadwick*, 100 P.3d at 467 (Colorado Supreme Court has "previously examined the actual language of the agreement for legal jargon, length and complication, and any likelihood of confusion or failure of a party to recognize the full extent of the release provisions"). "If there is no ambiguity, a contract will be enforced according to the express provision of the agreement." *B & B Livery*, 960 P.2d at 136.

Here, the Release is written in clear and simple terms, is free from legal jargon, is neither long nor complicated, and encompasses the risks encompassed by Ms. Squires' Fifth Claim for Relief. The Release specifically includes claims for negligence. The specific risk of

what occurred in the Accident is encompassed within the risks of BOEC's outdoor winter program.  *See Robinette*, 2009 WL 1108093 at * 3 ("specific risk of colliding with a snowmobile being operated by a ski resort employee is necessarily within the risks of skiing/riding") (internal quotation marks omitted).  The court does not find the Release ambiguous.

Nor does the court find the Release is reasonably susceptible to Ms. Squires' interpretation.  Ms. Squires interprets two provisions in the Release in a way that strains logic to conclude that the Release as a whole is ambiguous.  That Ms. Squires agrees to share the responsibility of safety during BOEC activities is not mutually exclusive from Ms. Squires agreeing to release claims arising out of BOEC activities.

Ms. Squires also notes the Release language that "BOEC has taken precautions to provide proper organization, supervision, instruction and equipment for each course," claiming that BOEC failed to do this, and querying how BOEC could shift this responsibility to its participants. Ms. Squires claims that BOEC's failures related to the equipment used, terrain selected, use of volunteers, control of the bi-ski, training and selection of instructors, assessment of plaintiff's disabilities, provision of instructions and safety precautions, and prevention of accidents with other skiers.  The Release specifically addresses that "although the BOEC has taken precautions to provide proper organization, supervision, instruction and equipment for each course, it is impossible for the BOEC to guarantee absolute safety." (*See* Doc. # 52-1).

When the Release is read as a whole and the words are given their generally accepted meaning, it is susceptible to one reasonable interpretation: that although BOEC has taken precautions, it cannot guarantee absolute safety; that there are serious risks

15

involved in BOEC activities; and that, to participate in BOEC activities, the releaser agrees to release BOEC from any and all claims related to a BOEC activity.  The Release by its plain language expresses the parties' intent to release BOEC from liability for all personal injuries resulting from negligence in conjunction with a BOEC activity.

Third, the court examines whether the Release was fairly entered into.  "A contract is fairly entered into if one party is not so obviously disadvantaged with respect to bargaining power that the resulting contract essentially places him at the mercy of the other party's negligence."  *Hamill*, 2011 WL 1168006 at *3 (citations omitted).  Ms. Squires does not challenge BOEC's ability to prove that the service provided here is a recreational service, not an essential service, and thus there is no unfair bargaining advantage.  Where the releasor fails to point to any other unfair circumstances surrounding the exculpatory agreement, the third factor is satisfied.  *See Mincin*, 308 F.3d at 1111.  As in *Chadwick*, Mrs. Squires signed the Release at home in Kansas, in advance of the ski trip.  100 P.3d at 469.  Mrs. Squires signed the Release voluntarily.  There is no suggestion that Mrs. Squires is not competent.  It is clear that Mrs. Squires is a devoted parent who has zealously tried to enhance her daughter's quality of life.  There is no evidence that the services provided by BOEC could not have been obtained elsewhere.  *See Hamill*, 2011 WL 1168006 at * 3 ("in assessing fairness, courts may also examine whether the services provided could have been obtained elsewhere") (citing *Jones*, 623 P.2d at 375).  Mrs. Squires is experienced and familiar with liability releases in general.  Ms. Squires has not demonstrated any other unfair circumstances surrounding the execution of the Release.

Finally, the court finds that the Release does not violate public policy.  The adaptive recreational ski services provided by BOEC are recreational and not a matter of great public

16

importance or practical necessity.  The evidence does not indicate that the Release was entered into in any unfair manner.  The Release does not exculpate BOEC from any duty in violation of public policy.  The Release does not undermine any competing public policy.  *See Robinette*, 2009 WL 1108093 at *4.  The expressed public policy in Colorado is "to encourage the affordability and availability of youth activities in this state by permitting a parent of a child to release a prospective negligence claim of the child against certain persons and entities involved in providing the opportunity to participate in the activities."  Colo. Rev. Stat. § 13-22-107(1)(a)(VI).

In sum, as the court finds no obvious disparity in bargaining power between the parties to the Release, that the parties' intentions are clear and unambiguous, that the agreement was fairly entered into, and that the Release does not violate public policy, the court concludes that the Release is valid.  *See Hamill*, 2011 WL 1168006 at *6 (Colo. App. Mar. 31, 2011) (determining exculpatory agreement was valid because it "did not implicate a public duty, did not involve an essential service, was fairly entered into, and it plainly expressed the intent to release prospective negligence claims"); *Chadwick*, 100 P.3d at 469-70 (enforcing exculpatory agreement releasing organizer of hunting trip from injuries sustained when he was thrown off mule, where exculpatory agreement unambiguously expressed the intent of the parties, was not unfairly entered into, injured party read agreement and understood he was executing a release of liability when he signed it, and agreement violated no duty to the public).  Ms. Squires has released "BOEC, its successors, representatives, assigns, and employees from any and all claims, demands, and causes of action" from any claims resulting from negligence in conjunction with a BOEC activity.

C.      Material Misrepresentation and Fraud in the Inducement

Ms. Squires argues that BOEC's Motion for Summary Judgment must be denied because the Release is voidable based on material misrepresentation and fraud in the inducement.  "A release is an agreement to which the general contract rules of interpretation and construction apply."  *Chase v. Dow Chemical Company*, 875 F.2d 278 (10th Cir. 1989) (citations omitted).  "Like any contract, a release procured through fraud can be set aside." *Id.*

Ms. Squires argues that BOEC fraudulently misrepresented in the Greetings Letter, on the reverse side of the Release, that all of its "activities are conducted in a manner consistent with the highest standards, as defined by the Association of Experiential Education ("AEE")," when in fact there were no written standards for the adaptive ski program, and that the program was accredited by AEE when in fact the program was not so accredited.  (*See* Doc. # 61-1 at 4 of 5).  There is no statement regarding AEE standards or accreditation in the Release itself.  (*See* Doc. # 52-1).  BOEC representative and Ski Program Director Paul Gamber testified that on the day of the Accident, BOEC did not have any written ski lesson policies and procedures for the adaptive ski program.  (*See* Doc. # 84-6 at 2 of 2).  BOEC's Ski Program Director, Jeffrey Inouye, testified that the AEE accreditation related to programs other than the adaptive ski program that Ms. Squires attended.  (*See* Deposition of Jeffrey Inouye (Doc. # 84-2) at 2 of 2).  Ms. Squires argues that based on the lack of written safety standards, "it is not a stretch to conclude that the adaptive skiing program was not conducted in a manner consistent with the highest standards of the AEE, contrary to the representations made by BOEC in its Greetings Letter."  (Reply Memorandum Brief Regarding

18

Misrepresentation (Doc. # 84) at 4 of 11).  Ms. Squires argues that Mrs. Squires relied on these claimed misrepresentation when she signed the Release on January 13, 2008.

In addition to its adaptive ski program, BOEC has a department that operates its wilderness program, which facilitates year-around programming for people with disabilities and special needs.  (See Doc. # 89-3 at 3 of 3).  The Greetings Letter is sent to participants involved in a wilderness course, who may or may not participate in the ski program.  (*See* Doc. # 89-1 at 2-5 of 5).  Groups interested in a wilderness course, which includes lodging and activities other than skiing, such as a ropes course, and climbing wall, will complete paperwork through the wilderness program.  *Id.*  Each program has its own separate set of forms to be completed by participants.  *Id.*  Groups who are interested only in skiing at BOEC will complete paperwork for the ski program.  (*See* Doc. # 89-1 at 2-5 of 5).  Ms. Squires was a student of BOEC as a participant of the Camp Fire USA group ("Camp Fire").  (*See* Doc. # 61-1 at 1-2 of 5).  For its trip to Colorado, Camp Fire contracted with the wilderness program for a five-day wilderness course that included transportation and lodging in addition to skiing. (See Wilderness Course Contract (Doc. # 89-2) at 1-2 of 2).  The Release and Greetings Letter were from the wilderness program.  (*See* Doc. # 89-1 at 3 of 5).

While BOEC's adaptive ski program did not have its own written ski lesson policies and procedures at the time of the Accident, it has at all times trained its instructors and followed the standards for adaptive skiing set forth by the PSIA, the governing body that establishes national standards for skiing.  (*See* Doc. # 89-3 at 2 of 3).  BOEC's adaptive ski program used the PSIA Core Concepts book, the Adaptive Ski Program Manual, and the Alpine Technical Manual.  (*See id.*; *see also* Doc. # 84-5).

"To establish fraud, a plaintiff has to prove that (1) a fraudulent misrepresentation of material fact was made by the defendant; (2) at the time the representation was made, the defendant knew the representation was false or was aware that he did not know whether the representation was true or false; (3) the plaintiff relied on the misrepresentation; (4) the plaintiff had the right to rely on, or was justified in relying on, the misrepresentation; and (5) the reliance resulted in damages." *Barfield v. Hall Realty, Inc.,* 232 P.3d 286, 290 (Colo. App. 2010) (citing CJI-Civ. 4th 19:1 (1998)). *See also J.A. Walker Co., Inc. v. Cambria Corp.*, 159 P.3d 126, 132 (Colo. 2007) (applying same elements to a fraudulent inducement claim). "Implicit within these elements are the requirements that the claimant demonstrate that it relied on the misrepresentation and that its reliance was justified under the circumstances." *Loveland Essential Group, LLC v. Grommon Farms, Inc.*, 251 P.3d 1109, 1116 (Colo. App. 2010) (citation omitted).

"The misrepresentation must be made with the intent to deceive and for the purpose of inducing the other party to act on it, and there must be evidence that the other party did in fact rely on it and was induced thereby to act to his injury or damage." *Club Valencia Homeowners Ass'n v. Valencia Assocs.*, 712 P.2d 1024, 1026-27 (Colo. App. 1985) (citation omitted). Ms. Squires has not produced any evidence that BOEC made the alleged misrepresentations with the intent to deceive. For failure to demonstrate this element, Ms. Squires' argument that the Release is voidable based on material misrepresentation and fraud in the inducement must fail.

Reasonable and justifiable reliance is also required for a claim of fraudulent misrepresentation. *Ivar v. Elk River Partners, LLC*, 705 F. Supp. 2d 1220, 1238 (D. Colo.

2010).  *See also Sheffield Services Co. v. Trowbridge*, 211 P.3d 714, 725 (Colo. App. 2009)

("a necessary element to all fraud actions is that the plaintiff justifiably relied on the

misrepresentation or the nondisclosure");  *Williams v. Boyle*, 72 P.3d 392, 399 (Colo. App.

2003) (element of fraudulent misrepresentation is "the right or justification in relying on the

misrepresentation").

The evidence fails to demonstrate justifiable reliance by Mrs. Squires on the

statements regarding AEE standards and accreditation in the Greetings Letter.  The

Greetings Letter emphasized the importance of reading and signing the Release on the

reverse side.  (*See* Doc. # 84-1 at 1 of 1).  The Release explains that skiing involves a risk of

serious bodily injury and that it is impossible to eliminate all risk.  (*See* Doc. # 52-1).  Despite

the emphasis on the importance of reading and signing the Release, Mrs. Squires did not

take particular note of the language in the Release.  "I can only say I assume I read it.  I have

no recollection of reading it before I signed it."  (*See* Doc. # 84-4 at 6 of 7).  Ms. Squires

propounds that Mrs. Squires paid close attention to the Greetings Letter but did not place any

importance on the Release itself, which contained the exculpatory provisions.  (*See id.* (the

Release contained "the same identical verbiage that is in every single risk and release of

liability that I've signed for 20 years on Kimberly's behalf for everything that she has ever

participated in. So I did not put any more credence towards this particular document than I

did anything else.")).  Mrs. Squires had substantial knowledge about the ski trip, learned from

Camp Fire's past experiences, communications with Ms. Breier, and BOEC's written

materials.  (*See* Doc. # 84-4 at 2-7 of 7).  The evidence does not support a finding that Mrs.

Squires justifiably relied on the information in the Greetings Letter regarding the AEE while

21

taking no notice of the exculpatory language in the Release she signed.  The evidence shows that Mrs. Squires did not make the decision for Ms. Squires to participate in the ski trip in reliance on the alleged misrepresentations.  The court concludes that Ms. Squires has not created a genuine issue of fact for trial on the element of justifiable reliance on the Greetings Letter.  For this reason also,  Ms. Squires' argument that the Release is voidable based on material misrepresentation and fraud in the inducement must fail.

D.     Willful and Wanton Conduct

The parties acknowledge that the Release cannot bar civil liability for gross negligence.  *See* Colo. Rev. Stat. § 13-22-107(4) ("Nothing in this section shall be construed to permit a parent acting on behalf of his or her child to waive the child's prospective claim against a person or entity for a willful and wanton act or omission, a reckless act or omission, or a grossly negligent act or omission.");  *Chadwick*, 100 P.3d at 467 ("In no event will an exculpatory agreement be permitted to shield against a claim of willful and wanton negligence.").

"Although the issue of whether a defendant's conduct is purposeful or reckless is ordinarily a question of fact, if the record is devoid of sufficient evidence to raise a factual issue, then the question may be resolved by the court as a matter of law."  *Forman v. Brown*, 944 P.2d 559, 564 (Colo. App. 1996).  *See also Terror Mining Co. v. Roter*, 866 P.2d 929, 935 (Colo. 1994) (summary judgment proper even when willful and wanton conduct alleged, where facts are undisputed and do not establish or imply willful conduct);  *United States Fire Insurance Co. v. Sonitrol Management Corp.*, 192 P.3d 543 (Colo. App. 2008) ("Ordinarily,

22

determining whether a defendant's conduct is willful and wanton is a question of fact.")
(citation omitted).

"Gross negligence is willful and wanton conduct, that is, action committed recklessly,
with conscious disregard for the safety of others." *Hamill*, 2011 WL 1168006 at *9 (citing
*Forman*, 944 P.2d at 564. "Willful and wanton conduct is purposeful conduct committed
recklessly that exhibits an intent consciously to disregard the safety of others. Such conduct
extends beyond mere unreasonableness." *Forman*, 944 P.2d at 564. *See also Stamp v. Vail
Corp.*, 172 P.3d 437, 449 (Colo. 2007) ("Conduct is willful and wanton if it is a dangerous
course of action that is consciously chosen with knowledge of facts, which to a reasonable
mind creates a strong probability that injury to others will result.") (internal quotation marks
and citation omitted);  *United Blood Servs. v. Quintana*, 827 P.2d 509, 523 n. 10 (Colo. 1992)
("Willful misconduct consists of conduct purposely committed under circumstances where the
actor realizes that the conduct is dangerous but nonetheless engages in the conduct without
regard to the safety of others.") (citation omitted)*;  Safehouse Progressive Alliance for
Nonviolence, Inc. v. Qwest Corporation*, 174 P.3d 821, 830 (Colo. App. 2007) ("Willful and
wanton behavior is defined as a mental state of the actor consonant with purpose, intent, and
voluntary choice.") (internal quotation marks and citation omitted).

Based on her expert witness, Mr. Gale's, opinion, Ms. Squires argues that BOEC
acted recklessly, precluding application of the Release.  Mr. Gale, a snow sports safety
consultant with 43 years of ski safety training and experience, concludes that BOEC acted
recklessly based on: (1) "an inherently unsafe bi-ski program administered and conducted by
BOEC," (2) BOEC instructor Jennifer Phillips' selection of inappropriately difficult terrain and

failure to follow proper lesson plan procedures, and (3) BOEC volunteer Jim Trisler's failure

to "do his job as a blocker, look-out . . . ."  (*See* Doc. # 56-4 at 9-11 of 11; Doc. # 56-5 at 1-2

of 8; Doc. # 88-8 (Curriculum Vitae)).

In his Expert Report, Mr. Gale concludes:

> The incident was the cumulative result of an inherently unsafe bi-ski program administered and conducted by BOEC. It knew or should have known that its "word of mouth" rather than written safety protocols and procedures were ineffective and substantially enhanced the risk over and above the inherent risks of skiing to Miss Squires. It purposely chose a dangerous course of training, supervision, and bi-ski program implementation. In doing do it created a strong probability that this circumstance was [a] predictable incident that was bound to happen sooner or later. It failed to address fundamental safety procedures even though it appears to do so in its other adaptive program offerings. . . This further demonstrates BOEC's willful, reckless, and comprehensive disregard for Miss Squire's safety.

(Doc. # 56-5 at 1 of 8, ¶ 5.2).  Mr. Gale also concludes that the conduct of BOEC's instructor,

Ms. Phillips, was intentional, willful, and reckless.

> The conduct of BOEC's instructor Jennifer Phillips fell well below the PSIA standards. As a PSIA certified instructor, she was or should be well aware of the policies, procedures, and standards for bi-ski instruction particularly terrain selection. The plethora of written PSIA instructional methodology and information addresses skill based instructional activities with safety as a fundamental priority and duty. She intentionally made the decision to abandon the PSIA lesson plan and sequential format for bi-ski instruction. This conduct demonstrates intentional, willful, and reckless disregard for Miss Squire[s'] safety.

(Doc. # 56-5 at 1 of 8, ¶ 5.3).  Mr. Gale further identifies reckless conduct with regard to the

use of slip knots to ensure that the bi-ski would remain tethered to the BOEC instructor. He

concludes that:

> Defendant BOEC was or should have been fully aware of the dangers of a detached bi-ski caused by the reckless choice not to properly utilize or dangerously utilize BOEC's own slip knot rule powerfully hitting some object, person, or a tree. The safety procedures, training, and program risk management did not match the risk nor fully address the safety requirements

24

dealing with a detached and out of control bi-ski loose on the slope. The foreseeable consequence was a serious injury to the student, the public, or both. The entities recklessly disregarded Miss Squires['] safety and willfully created this higher than normal risk for Miss Squires. There were no prudent or careful precautions taken to reduce or lessen the risk of this predictable and foreseeable incident.

(Doc. # 56-5 at 2 of 8, ¶ 5.5).

Mr. Bil Hawkins of Knott Laboratories also provided an expert report.  (*See* Doc. # 56-2).  Mr. Hawkins has a B.S. in civil engineering and is a certified Level II Rope Access Technician.  (*See* Doc. # 88-5).  Mr. Hawkins examined the safety knot, or slip knot, used to fasten the bi-ski's tether to BOEC instructor Ms. Phillips.  This knot was the only mechanism that prevented the downhill movement of the bi-ski.  Mr. Hawkins concludes in his expert report:

Based upon Knott Laboratory's inspection, the available evidence, and this engineer's education, training, and experience, the following conclusions have been reached within a reasonable degree of engineering certainty:
• Ms. Phillips was not certified to [i]nstruct students on a bi-ski device at the time of Ms. Squires['] accident on February 13, 2010
• BOEC knew or should have known that Ms. Phillips was not certified to instruct participants on a bi-ski device at the time of Ms. Squires['] accident on February 13, 2010
• Ms. Phillips did not follow BOEC's written policy by providing two independent means of anchor when providing sole support to a participant on a rope device
• The safety knot Ms. Phillips reportedly tied directly against the skin of her wrist would not have slipped off her arm had it been tied properly

(Doc. # 56-2 at 11 of 11).

There is thus some evidence in the record that it may have been reckless for Ms. Phillips to take Ms. Squires on Cashier, a blue run, on the day of the Accident.  Ms. Squires was a blind, first-time skier strapped to a bi-ski with no means to control her own speed or direction.  It was BOEC policy to start such a student on a green run.  (*See* Deposition of Paul E. Gamber (Doc. # 97-11) at 2 of 2).  *But see* Deposition of Stanley Gale (Doc. # 90-5)

25

at 2 of 2 ("Q: Are you saying – are you saying that it's wrong to have an adaptive bi-skier on Cashier run?  A: No.");  Expert Report of Ruth Ann DeMuth (Doc. # 100-5) at 5 of 6 (BOEC employee Jennifer Phillips "did not compromise the safety of Miss Squires by going up the Beaver Run Lift to Cashier.").

The court cannot conclusively determine based on the evidence before it whether there was a purposeful or conscious failure to use a slipknot or tie the properly.  The use of a slipknot with a bi-ski is the established BOEC policy.  (*See* Deposition of Jennifer L. Phillips (Doc. # 100-3) at 2-3 of 3; Deposition of Paul E. Gamber (Doc. # 100-4) at 4 of 4). Witnesses who were asked agreed that it could be reckless to conduct a bi-ski lesson without a properly-tied slip knot tethering a bi-ski with fixed outriggers.  (*See* Deposition of Jennifer L. Phillips (Doc. # 90-8) at 2 of 2;  Deposition of Peter W. Axelson (Doc. # 97-9) at 3 of 3; Deposition of Paul E. Gamber (Doc. # 97-11) at 2 of 2; (Doc. # 90-7) at 2 of 2;  Deposition of Ruth Ann DeMuth (Doc. # 90-6) at 2 of 2; Deposition of Patrick B. Kelley (Doc. # 90-4) at 2 of 3).  Mr. Hawkins concludes that "[t]he safety knot Ms. Phillips reportedly tied directly against the skin of her wrist would not have slipped off her arm had it been tied properly." (Doc. # 56-2 at 11 of 11).

This evidence and these conclusions by the expert witnesses could demonstrate reckless, grossly negligent, and willful and wanton acts and omissions.  A jury could conclude there was purposeful conduct committed recklessly with conscious disregard for the rights and safety of Ms. Squires.  The evidence, viewed in a light most favorable to Ms. Squires, might lead a reasonable jury to conclude that BOEC was conscious of its conduct and the existing conditions and knew there was a strong probability that injury to Ms. Squires would result.  The court concludes that Ms. Squires is properly afforded an opportunity to present to

a jury evidence of the alleged willful and wanton, reckless, or grossly negligent acts or omissions.  It will best be determined at trial, after the submission of Ms. Squires' case in chief, whether BOEC acted recklessly.

The court addresses separately Ms. Squires' argument that BOEC volunteer, Mr. Trisler's, "acts and omissions" were "more than mere recklessness."  (*See* Doc. # 56 at 14 of 19).  Mr. Gale concludes that

> [t]he conduct of BOEC trained Jim Trisler fell below the duty of a blocker. He did absolutely nothing to prevent the collision or intervene prior to the collision between Jennifer Phillips and Michael Goodwin. He failed in his essential duties which were to prevent the collision, or at the very least, to reduce the severity of the consequences.

(*See* Doc. # 56-5 at 2 of 8, ¶ 5.4).  *See also* Doc. # 56-4 at 10 of 11 ("he did not do his job as a blocker, look-out, or make his presence known to Michael Goodwin.  Apparently, he did not hear or see Michael Goodwin coming down out of control before the powerful impact.  He was not vigilant nor did he fulfill his duty and responsibility to protect and warn.  It seems that he was not on the look-out as he should have been or he would have likely seen Michael Goodwin skiing too close, out of control, and headed for Jennifer Philips and Miss Squires['] bi-ski device.").  Ms. Squires argues that '[a]lthough Mr. Gale does not specifically use the word reckless in describing Mr. Trisler's acts and omissions, his analysis and description describe more than mere recklessness."  (Response (Doc. # 56) at 14 of 19).  The court disagrees.  Colorado law defines negligence as "a failure to do an act which a reasonably careful person would do, or the doing of an act which a reasonably careful person would not do, under the same or similar circumstances to protect . . . others from bodily injury, . . ." CJI-Civ. 9:6 (2011).  The evidence in the record, including Mr. Gale's opinion, amounts to no more than negligence by Mr. Trisler.  As to Mr. Trisler, there is insufficient evidence to create

27

a genuine issue of material fact that he acted willfully and wantonly, that is, that he consciously chose a dangerous course of action with knowledge of facts that, to a reasonable mind, created a strong probability that injury to Ms. Squires would result.  The Release thus bars Ms. Squires' claim based on Mr. Trisler's conduct.

Accordingly, IT IS ORDERED that:

1.      Defendant BOEC's Motion for Summary Judgment (filed December 3, 2010) (Doc. # 52) is GRANTED IN PART AND DENIED IN PART.

2.      The Fifth Claim for Relief in the Second Amended Complaint (Doc. # 13) shall proceed against Defendant Breckenridge Outdoor Education Center only on the alleged willful and wanton, reckless, or grossly negligent acts or omissions.

3.      The court will hold a Telephonic Status Conference on Thursday December 8, 2011 at 8:30 a.m.  Counsel for the parties shall create a conference call and then telephone the court at 303-844-2117 at the scheduled time.

DATED at Denver, Colorado, this 8th day of November, 2011.

BY THE COURT:


___s/Craig B. Shaffer_____
United States Magistrate Judge